# MACKALL v. RICHARDS.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Argued November 10, 1884.—Decided November 24, 1884.

When a mandate of this court, made after hearing and deciding an appeal in equity, directed such further proceedings to be had in the court below as would be consistent with right and justice, and that court thereafter made a decree which prejudiced the substantial rights of a party to the suit, in respect of matters not concluded by the mandate or by the original decree, its action touching such matters is subject to review, upon a second appeal.

This suit involved the title to that part of square 223, in the City of Washington, designated as lot 7, at the southwest corner of New York Avenue and Fourteenth Street. Its building line on the avenue was about 152 feet and 9 inches in length, and on Fourteenth Street a little less; while the south line, which was at right angles with Fourteenth Street, was about 100 feet, and the west line, which was at right angles with the avenue, was about 97 feet 5 inches, in length. In June or July, 1864, the lot was subdivided by Brooke Mackall, Jr., under whose control it then was, into five smaller lots, each fronting on New York Avenue. This subdivision was not recorded in any public office, but a rough plat of it, exhibited in the record, appears upon the books of Mr. Forsythe, a surveyor and civil engineer, who made it at the instance of Mackall.

In the same year, shortly after this subdivision, Mackall commenced the erection of a building at the southwest corner of the Avenue and Fourteenth Street, known as Palace Market. That building, he testified, was "to cover two of the sub-lots on New York Avenue." In 1867, Plant and Emory, having furnished materials and performed labor on the building, com-

menced suits at law, in the Supreme Court of this District, to enforce liens for the amount of their claims, and each obtained judgment therefor against Mackall. The part of lot 7, upon which Plant asserted a lien, was thus described in his declaration : "Beginning for the same at the northeast corner of the said square, running thence south 44 feet; thence west to the west line of the said lot; thence, in a northerly direction with the west line thereof, to the north line of the said lot; and thence, in a northeasterly direction with the said north line, to the place-of beginning." The description in Emory's suit was this : "Part of lot 7, in square No. 223, beginning for the same at the northeast corner of said lot, and running thence south 44 feet; thence west to the west line of said lot; thence, with a line at right angles to New York Avenue, to the north line of said lot ; and thence, in a northeasterly direction, with the said north line, to the place of beginning."

Subsequently A. & T. A. Richards obtained judgment in the same court against Mackall for $897.42, with interest and costs, execution upon which was levied on the same property on which Plant and Emory claimed to have liens. Under executions in favor of these several creditors the property was sold by the marshal. Alfred Richards became the purchaser at $2,500, and received a conveyance. The proceeds of the sale were sufficient to discharge in full the claims of Plant and Emory and $646.89 of the judgment obtained by A. & T. A. Richards.

This suit was brought in 1871 by A. & T. A. Richards (a part of whose judgment remained unpaid) and other judgment creditors of Mackall, for the purpose of subjecting to the claims of themselves and other creditors who might become parties and share the expenses of the litigation, such part of lot 7 as remained "after taking or carving out therefrom the aforesaid piece or part thereof so as aforesaid taken, sold, and conveyed by the marshal of the District of Columbia to Alfred Richards," &c. The bill set forth that the title to the lot was really in Mackall, but that, for the purpose of hindering and defrauding his creditors, he withheld all evidence of it from the public records of the District. The prayer was that he be

required to discover and place on record all conveyances or other evidences of his title, and that the remainder of lot 7, not sold by the marshal to Richards, be sold, and the proceeds applied, first to the discharge of existing encumbrances, and then to the judgments of complainants.

Such proceedings were had that, by final decree in special term, on the 1st day of May, 1873, it was adjudged that the title " to all of lot numbered 7, in square numbered 223, in the city of Washington, not heretofore sold by the marshal of the District of Columbia, to the complainant Alfred Richards, is vested in the defendant Brooke Mackall, Jr., and that the same be sold," &c. Trustees were designated by whom the sale should be conducted. That decree was affirmed in general term. Upon appeal to this court the decree in general term was itself affirmed without modification, and the cause remanded for such proceedings as would be consistent with right and justice. In this court, the only dispute was as to the sufficiency of the evidence to show title in Mackall, and no question was made as to the indefiniteness of the description of the interest or property decreed to be sold, or as to the validity of the marshal's sale.

Subsequently, the trustees named in the original decree executed the order of sale and made report of their acts; but, upon exceptions filed, the sale was, on July 24, 1877, set aside, the order providing that before sale can be made " the amount to be sold must be definitely ascertained by some proper legal procedure." The sale was set aside partly because it appeared, upon the hearing of the exceptions, that the trustees announced at the biddings that they did not know, and did not undertake to state, what were the precise lines or boundaries of the ground to be sold, and would not undertake to do more than sell such part of lot 7 as was outside of that embraced by the marshal's deed to Alfred Richards, leaving purchasers to find out as best they could the extent of their purchase. Bidders were informed that " whether the south line of Richards' purchase runs southwesterly from the front or southeast corner of the building along the line of the fence, . . . parallel to and 44 feet from New York Avenue, or whether it runs due

west along the south side of the building to its rear end, and from thence westerly to the rear end of the lot, is a legal question which the trustees do not undertake to determine."

By an order entered July 13, 1878, the cause was referred to a special auditor to report " the proper metes and bounds of that portion of lot No. 7, in square 223, which was sold by the marshal of the District of Columbia to Alfred Richards, and also that other portion of said lot not so sold, and which is directed by the decree in this case to be sold by the present trustees." He reported that, upon examining the testimony, the proceedings in the mechanics' lien suits, the returns upon the executions under which Richards had purchased, the advertisement of sale and the marshal's deed of conveyance, he could not reach a conclusion as to how much ground was intended to be sold or conveyed to Richards.

Exceptions by the complainants to this report were sustained, and the court, " proceeding to determine the said boundaries in accordance with the said order of July 24, 1877," directed the trustees to sell, in accordance with the terms and provisions thereof, all that portion of lot seven lying south of a line drawn from a point on Fourteenth Street 44 feet south of the northeast corner of said lot, and running thence parallel with New York Avenue to the west line of lot seven. This order was made " without passing upon the validity of the said marshal's sale." A similar decree was passed in general term, accompanied by a recital that it should be construed " as not determining any question of title to any portion of said lot 7 lying north of said line." 1 Mackey, 444. The present appeal was from the latter decree.

*Mr. W. Willoughby*, for appellant.

*Mr. W. B. Webb* and *Mr. Enoch Totten*, for appellee, argued several questions presented by the record. On the point as to the extent of the questions open on appeal from the execution of a mandate of this court they said: This being a second appeal, nothing is brought for re-examination except proceedings subsequent to the mandate. *The Lady Pike*, 96

U. S. 461; *Himeley* v. *Rose*, 5 Cranch, 313; *Roberts* v. *Cooper*, 20 How. 467; *Noonan* v. *Bradley*, 12 Wall. 121. There can be no question, that after a case has been heard and determined in this court, and its mandate sent to the court from whence the case came, the only duty of the court below is to carry the decree and mandate into execution. From the earliest days of the court this doctrine has been asserted. *Skillern's Ex'r* v. *May's Ex'r*, 6 Cranch, 267; *Ex parte Story*, 12 Pet. 339, 342; *Sibbald* v. *United States*, Ib. 488, 492; *Noonan* v. *Bradley*, *supra*; *The Lady Pike*, *supra*.

MR. JUSTICE HARLAN delivered the opinion of the court. He stated the facts in the foregoing language, and continued:

The action of the court below directing the sale of only so much of lot 7 as lies south of a line running from a point 44 feet south of its northeast corner parallel with New York Avenue to the west line of the lot, leaving undetermined the question of the title to that part of the lot lying north of that parallel line, is subject to review, upon this second appeal, if, as appellant contends, the proceedings subsequent to the decision here are erroneous and prejudical to his substantial rights in respect of matters not concluded by the original decree. His claim is that the natural and established front of lot 7 is on New York Avenue, and that the sale of the piece south of the said parallel line, separately from the ground north of it, will materially, as well as needlessly, impair the value of both, especially the former. We are of opinion that this claim is, in all respects, well grounded; and that the appellant is entitled to a reversal, unless it appears from the record that the ground north of the said line running from Fourteenth Street parallel with New York Avenue—which ground was, in effect, withdrawn from the operation of the original decree—was embraced by the sale of the marshal to Richards. Unless sold heretofore by the marshal, it is covered by the original decree, which this court affirmed.

The question as to what part of lot 7 was not sold by the marshal to Richards is attended with difficulty and embarrass-

ment.   But it is one which the court below was bound, under the issues, to determine, in order that its decree of sale might be properly executed.   Upon examination of the marshal's advertisement of the sale at which Richards purchased, and of the deed which the latter received, we find no such description of the property sold and conveyed as will certainly embrace that part of lot 7 which lies west and westerly of the building erected at the corner of New York Avenue and Fourteenth Street, and north of the line described in the final order as commencing from a point on Fourteenth Street 44 feet south of the northeast corner of said lot, and running thence parallel to the line of New York Avenue to the west line of said lot. The advertisement of sale thus describes that part of lot 7 then proposed to be sold: "Beginning at the northeast corner of said square [223] and running thence south 44 feet; thence west to the west end of the lot; thence, in a northerly direction with the west line thereof, to the north line of said lot; thence with said north line to the place of beginning."   The description in the marshal's deed to Richards is the same as that in the advertisement of sale, except that, instead of the words "thence west to the west end of the lot," the call in the deed is "thence westerly to the west end of the lot."   The line running south from the northeast corner of the lot along Fourteenth Street is aptly described.   But what is meant by the words "west to the west end of the lot" in the advertisement of sale?   If by "west end of the lot" is meant its northwest corner, where its west line meets New York Avenue, and if by "west" is meant due west, then a line running due west from Fourteenth Street will not strike the west end of the lot, but will intersect New York avenue some distance northeast of the northwest corner of the lot.   Further: If "west to the west end of the lot," means "*westerly* to the northwest corner of the lot," then there would be left outside of the ground upon which the building stands, and north of the line thus drawn, a narrow irregular slip of ground, diminishing in width as the line runs westerly, and which it cannot be supposed it was within the contemplation of the marshal or of any of the parties interested to sell.

· But we do not suppose that by "west end of the lot" was meant its northwest corner, where its west line meets New York Avenue; because, the next call which appears in the levies, in the advertisement of sale, and in the marshal's deed— "thence in a northerly direction *with the* west *line* thereof to the north line of said lot"—would then be meaningless. We incline to think that by "west end of the lot" was meant "west line of the lot." Such, as we have seen, is the call in the mechanic's lien suits. This would make intelligible the succeeding call, "thence in a northerly direction with the west line thereof." But even this interpretation does not dissipate the confusion which arises from these inconsistent descriptions of the property; for, if the line starting from Fourteenth Street is run due west, it will not strike any point in the west line of the lot. And if it be run westerly, which may mean north of west or south of west, to what point on the west line of the lot must it be run? The appellee contends that it should be run parallel with New York Avenue. The answer to that suggestion is that the descriptions in the lien suits, in the levies, and in the marshal's advertisement and conveyance will be satisfied by running north or south of that parallel line to any one of numerous points on the west side or line of the lot.

We are here met with the suggestion that the sale was made in discharge of certain mechanics' liens, and that the description of the property in the marshal's advertisement and deed should be held to include all the ground which could have been included under the laws in force in this District on the subject of such liens. That law provides, in respect of a building in the city of Washington or Georgetown, that "the ground on which the same is erected, and a space of ground equal to the front of the building and extending to the depth of the lot on which it is erected, shall also be bound by the said lien," subject to the condition that the land, at the time of the erection or repair of the building, is the property of the person contracting for such erection or repairs. R. S. Dist. Col. § 704, 11 Stat. 377.

The argument implies that the statute gave a mechanic's lien

upon so much of the lot as would constitute a parallelogram bounded on the east by the line of 44 feet on Fourteenth Street, on the south by a line parallel with New York Avenue, on the west by the west line of the lot, and on the north by the line of New York Avenue. But the inherent difficulty in this view arises from the description in the marshal's advertisement and in his deed for the property actually sold and conveyed. That description will not cover the ground included in the supposed parallelogram. Further: if the front of the building is conceded to be on Fourteenth Street, the lot over which the statute extended the mechanic's lien would not be the ground between New York Avenue and a line running parallel with, and 44 feet from, it. In such case, the ground covered by the lien would rather be that which lies north of a line commencing 44 feet south of the northeast corner of the lot, and extended at right angles from Fourteenth Street until it strikes New York Avenue. But a conclusive answer to the suggestion based upon the mechanic's lien law, is that, so far as the record discloses, Plant and Emory did not, when enforcing their claims, assert a lien upon the ground within the before-mentioned parallelogram.

We are of opinion, upon the whole case, that the record fails to show that any part of lot 7, outside of the piece upon which the building at the northeast corner of the lot stands, was sold or conveyed by the marshal to Richards ; consequently, for the purposes of this suit, and as between the parties thereto, all of lot 7, except the part actually covered by the building, must be deemed to be embraced by the original decree, and to be subject to sale, as therein adjudged, in satisfaction of the demands of complainants.

Whether that part of the lot upon which the building stands is still the property of Mackall, that is, whether the sale and conveyance of the marshal is valid in respect, at least, of that part of the lot, we do not determine. We forbear any expression of opinion upon that question, because it is evident that the complainants did not seek, nor the court below intend, by the original decree, to subject to sale the ground on which the building stands ; and, also, because the validity of the marshal's

sale is directly involved, as we are informed by counsel, in a distinct suit upon our docket, not yet reached.

*The decree must be reversed, and the cause remanded, with directions to the court below to set aside the decree from which this appeal is prosecuted, and to order the sale, in satisfaction of the complainants' demands, and in such mode as may be consistent with the practice of the court and with law, of lot 7 outside of the part upon which the building known as the Palace Market stands.*